# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NORWALK HARBOR KEEPER, et al.,
    Plaintiffs,

v.

U.S. DEPARTMENT OF
TRANSPORTATION, et al.,
    Defendants.

No. 3:18-cv-0091 (SRU)

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs, Norwalk Harbor Keeper and Fred Krupp ("Plaintiffs"), brought suit against the

U.S. Department of Transportation ("DOT") and Elaine L. Chao in her official capacity as

Secretary of DOT; the Federal Transit Administration ("FTA") and Matthew Welbes in his

official capacity as Executive Director of the FTA (together these defendants are referred to as

"Federal Defendants"), as well as the Connecticut Department of Transportation ("CTDOT") and

James P. Redeker in his official capacity as Commissioner of the CTDOT ("State Defendants")

(collectively, Federal Defendants and State Defendants will be referred to as "Defendants").

Plaintiffs claim that Defendants' environmental analysis pursuant to the National Environmental

Policy Act ("NEPA") regarding the replacement of the Norwalk River Bridge in Norwalk,

Connecticut was inadequate.

Plaintiffs have filed a motion for summary judgment, arguing that "Defendants have not

complied with NEPA." Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for

Summary Judgment ("Pls' Memo"), Doc. No. 42-1, at 1. Federal Defendants have also moved

for summary judgment, arguing that Plaintiffs "failed to demonstrate FTA's Finding of No

Significant Impact ('FONSI'), which incorporates by reference the Environmental Assessment

('EA'), of the Walk Bridge Replacement Project was arbitrary, capricious, or not in accordance with the law." FTA Defendants' Memorandum of Law in Support of Motion for Summary Judgement ("Defs' Memo"), Doc. No. 43-1, at 1-2.[1]

For the reasons set forth below, I hold that the Plaintiffs do not have standing to bring this lawsuit. In the alternative, even if they do have standing to sue, summary judgment is granted in favor of the Defendants on the merits.

## I.     Standard of Review

### A.  Summary Judgment

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). On cross-motions for summary judgment, "neither side is barred from

---

[1] State Defendants filed a brief adopting by reference the arguments set forth in Federal Defendants' Motion for Summary Judgment, Memorandum of Law in Support, and Local 56(a) Statement filed on October 16, 2018 (Doc. No. 44) as well as Federal Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. No. 51). Therefore, all Defendants' claims are considered together.

asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). When, as here, both parties seek summary judgment, "a district court is not required to grant judgment as a matter of law for one side or the other." *Id*. "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*. (internal citations and quotation marks omitted).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

B. <u>NEPA</u>

NEPA creates no private right of action. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Thus, challenges to compliance with NEPA are usually brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. *Id.*

Although a court's review under the APA should "be searching and careful," it is not de novo. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989). Review of an agency's decision under NEPA is controlled by the "arbitrary and capricious" standard of the APA. *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997); *see* 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard prohibits a court from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). In conducting its review, the district court is "relegated to affirming the agency's decision so long as a rational basis is presented for the decision reached." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985).

Under NEPA, plaintiffs are limited to challenging, and the court to reviewing, the agency's decision making process, not the agency's decision. *See Kleppe*, 427 U.S. at 410 n.21 ("Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions."); *Strycker's*

4

*Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980) (court "cannot interject itself into the area of [agency] discretion"). "The court's role is to ensure that NEPA's procedural requirements have been satisfied…." *Fund for Animals v. Kempthorne*, 538 F.3d 124, 137 (2d Cir. 2008) (citing *Kleppe*, 427 U.S. at 410 n.21) (holding that court's role is to ensure agency took a hard look at environmental consequences)).

When reviewing factual determinations by an agency under NEPA, a court "must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *see also Nat'l Audubon Soc'y*, 132 F.3d at 19 (role of reviewing court is to ensure NEPA compliance without infringing upon the agency's decisions in areas where it has expertise); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013) (because the NEPA process "involves an almost endless series of judgment calls ... the line drawing decisions ... are vested in the agencies, not the courts") (quoting *Duncan's Point Lot Owners Ass'n, Inc. v. F.E.R.C.*, 522 F.3d 371, 376 (D.C. Cir. 2008)).

"A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Rather, a court evaluates "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1553 (2d Cir. 1992) (internal citation and quotation omitted). "NEPA merely prohibits uninformed - rather than unwise - agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

The District of Connecticut has stated that its "[j]udicial review is guided by the 'rule of reason,' which assesses whether NEPA review 'has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors

involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.'" *Nat'l Post Office Collaborate v. Donahoe*, 2014 WL 6686691, at *7 (D. Conn. Nov. 26, 2014) (quoting *Suffolk Cnty v. Sec'y of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977)).

## II.     Background

The following facts are drawn primarily from Plaintiffs' Local Rule 56(a)1 Statement of Undisputed Material Facts ("Undisputed Facts"), Doc. No. 42-2, and Defendants' Local Rule 56(a)2 Statement ("Disputed Facts") and Local 56(a)3 Statement of Additional Material Facts ("Additional Facts"), Doc. No. 50-1.[2]

The bridge at issue (the "Walk Bridge") is a movable railroad bridge that was constructed in 1896. It was designed and constructed to allow upriver access, which, at the time, was a hub of industry and maritime commerce called the "Upriver Shoreline." The Walk Bridge carries rail traffic across the Norwalk River for Amtrak and the New Haven line of Metro-North Railroad, the most heavily trafficked commuter line in the United States. The bridge is surrounded by wetlands on both sides. There are two 235-foot towers, one on each side of the river, which support high voltage power transmission lines used by the utility company Eversource, as well as by Metro-North as communication lines.

---

[2] Defendants filed a separate Rule 56(a)(1) Statement of Undisputed Facts, Doc. No. 43-2, and Plaintiffs responded, Doc. No. 48-1. Defendants' Statement includes a background section regarding NEPA's requirements, which is summarized in the Standard of Review section of this opinion, as well as details explaining meetings and discussions that took place throughout the NEPA review process, which are cited throughout this opinion rather than compiled in an additional factual summary of the case.

The Walk Bridge separates the Upriver Shoreline section of the Norwalk River from Norwalk Harbor, and the Upriver Shoreline is navigable for approximately one mile. There is little industry along the Upriver Shoreline. Industry has been replaced primarily by riverfront housing. Marine traffic in Norwalk Harbor has generally declined since 2008. When the Walk Bridge is closed, at mean high water there is approximately 16 feet of vertical clearance for vessels on the river to pass underneath. At mean low water, there is approximately 23 feet of vertical clearance.

On February 3, 2015, CTDOT published a Notice of Scoping, entitled "Replacement of the Norwalk River Railroad Bridge", explaining the basic goals of the bridge replacement project, which is the subject of this lawsuit. CTDOT invited the public to comment on the project and the scope of issues that should be addressed in the project's environmental review. At the time that the Notice of Scoping was released, the stated purpose of the project did not include preserving and enhancing maritime navigation.

Approximately two months later, on March 5, 2015, at an inter-agency meeting about the project, Connecticut's Office of Policy Management ("CTOPM") asked whether CTDOT had considered replacing the Walk Bridge with a fixed bridge design rather than a movable bridge design. CTDOT responded that the agency had decided to go forward with a movable bridge design. On a website created for the Walk Bride Project, language stated that "[t]he new or rehabilitated Walk Bridge will improve maritime navigation of the Norwalk River." Undisputed Facts at ¶ 16. On March 10, 2015, CTOPM issued a comment letter to CTDOT responding to CTDOT's Notice of Scoping, noting that the project purpose in the Notice of Scoping referred only to constructing "a resilient bridge structure which will enhance the safety and reliability of commuter and intercity passenger rail service" and did not include a proposed purpose of

improving maritime navigation. CTOPM suggested that CTDOT consider a fixed bridge alternative because maintaining maritime navigation did not appear to be an essential element of the Walk Bridge Project. CTOPM also suggested that CTDOT consider whether the benefits of a fixed bridge might outweigh the loss of navigability for boats that were too large to pass underneath the bridge.

In May 2015, CTDOT completed a Conceptual Engineering Report, which considered options for replacing the Walk Bridge, and which was a "precursor" to a more complete navigational analysis that would be part of an application to the U.S. Coast Guard for a permit to reconstruct the Walk Bridge. The Conceptual Engineering Report identified two primary commercial interests that interact with the Walk Bridge and require an opening of the bridge to reach their final destinations: barges and tugs serviced by Devine Brothers and tall-mast sail boats maintained by United Marine.

Defendants issued an Environmental Assessment ("EA") for the Walk Bridge Replacement Project, as required by NEPA, on August 26, 2016. In the EA, the project's purpose included "maintaining or improving navigational capacity and dependability for marine traffic in the Norwalk River." Undisputed Facts at ¶ 27. The parties disagree whether the primary purpose of the project is simply to restore or replace the Walk Bridge for rail transit or whether the broader purpose is "to rectify the existing deficiencies of the existing bridge, including its age and deterioration, decreasing reliability, safety standards, and difficulty of maintenance [and incorporate] federal and state transportation goals for the New Haven Line/Northeast Corridor (NHL/NEC)." Disputed Facts at ¶ 28. The parties agree that the purpose relating to maintaining or improving navigational capacity is a secondary purpose of the project. A fixed bridge built at

8

approximately the current height of the existing Walk Bridge would meet all Project Purpose and Need criteria except for maintaining upriver navigation.

Plaintiffs contend that the EA did not assess a number of potential factors for the Existing Level Fixed Bridge option, including: (1) the potential resiliency benefits; (2) potential railroad safety and reliability benefits; (3) balancing the needs of rail and waterborne transport; (4) the potential impact of navigational access; (5) potential change to marine commerce in Norwalk Harbor; (6) the actual present navigational needs to access the area of Norwalk River north of the Walk Bridge; and (7) what is fully required to meet a United States Coast Guard ("USCG") navigational clearance determination before issuing an EA, Record of Decision ("ROD"), or Finding of No Significant Impact ("FONSI"). Defendants counter that the EA assessed the potential resiliency benefits, potential railroad safety and reliability benefits, balanced the needs of rail and waterborne transport, assessed the navigational impact of each Fixed Bridge Alternative, and considered actual and future marine commerce.

The Norwalk Harbor Keeper submitted public comments criticizing the EA's study of upriver navigational needs and arguing it failed to study a fixed bridge alternative, among other alleged defects. The EA stated that removing the High Towers adjacent to the Walk Bridge, relocating the high voltage transmission line for Eversource, and the relocation of the Metro-North communication line, would all be necessary to construct the movable bridge alternative. The EA acknowledged that the Eversource Transmission Line relocation would be a secondary impact of the Walk Bridge Replacement Project.

In June 2017, CTDOT issued a ROD containing a final determination regarding the environmental review of the Walk Bridge Replacement Project. The ROD selected a movable bridge design for the project. The Fixed Bridge Alternative Issue Paper CTDOT attached to the

ROD noted that CTDOT considered four fixed bridge alternatives at the conceptual level. Benefits of a fixed bridge included that it would be safe, resilient, and less expensive to construct than the preferred alternative. However, there were also deficiencies with the fixed bridge option: it would prohibit all current navigation traffic that required an opening of the existing Walk Bridge and would lengthen the construction period. Specifically, the construction period for a movable bridge would take approximately 40 months to complete, but construction for a fixed bridge alternative would take between 52 and 64 months. For a movable bridge, there would be only two complete channel outages during the construction period, compared to the construction of a fixed bridge alternative, during which "multiple complete channel closures would be required." Additional Facts at ¶¶ 2-3.

On July 6, 2017, CTOPM issued a letter concluding that the EA satisfied the requirements of NEPA. CTOPM's letter, which challenged the decision to elevate maritime access above other economic and social considerations, still approved the project because the costs and benefits of a movable bridge justified other local impacts. CTOPM also stated that DOT would need to "make every effort to mitigate such impacts." OPM Review Letter, App'x C-3 to Final ROD, Doc. No. 30-1 at 852, RECORD0023384.

On July 17, 2017, FTA issued a FONSI on the environment for the project. The FONSI determined that the EA satisfied NEPA's requirements and no further NEPA review was required unless the project's specifications changed, or new information or environmental concerns arose.

## III.    Discussion

In their motion for summary judgment, Plaintiffs argue: (1) that Norwalk Harbor Keeper and Fred Krupp have standing to sue; (2) that the EA failed to study a reasonable range of alternative bridge designs; (3) that Defendants failed to meaningfully respond to Norwalk Harbor Keeper's Comments on the EA; and (4) that Defendants unlawfully segmented the project.

In Defendants' cross motion for summary judgment, Defendants argue: (1) the Walk Bridge Project decision-making process was not arbitrary and capricious under NEPA because the agency properly and adequately framed the Purpose and Need statement, properly and adequately considered alternatives that satisfied the Walk Bridge Replacement Project's Purpose and Need, and properly and adequately provided opportunity for public comment on the project; and (2) the project was not improperly segmented.

For the reasons that follow, summary judgment is granted in favor of Defendants.

### 1.    *Standing*

Plaintiffs do not sue to stop the Walk Bridge replacement project. At oral argument, Plaintiffs' counsel disclaimed any intent to bring the project to a halt. Plaintiffs do not even claim that an Environmental Impact Statement is required before the project can proceed. Their complaint only seeks to enjoin the disbursement of federal funds "until an adequate EA is completed." Compl., Doc. No. 1, Prayer for Relief, at 25. Plaintiffs complain that the selection of a movable bridge design will cause "needlessly protracted disruption to the recreational and aesthetic value of the Norwalk River." *Id.* at ¶ 15. The question is whether the Plaintiffs have standing to raise their procedural challenge that the EA inadequately considered the possibility of a fixed bridge design. I conclude that they do not.

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180–81 (2000) (internal citation omitted); *see also Bldg. & Const. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc*., 448 F.3d 138, 144 (2d Cir. 2006). Ordinarily, environmental plaintiffs need not allege injury to the environment to have standing; instead, they "adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc.*, 528 U.S. at 183 (internal citation omitted).

Here the challenged activity is not the bridge reconstruction; if it were, Plaintiffs' recreational and aesthetic interests might be sufficient to support standing.[3] Rather, Plaintiffs allege that the disruption to the recreational and aesthetic value of the Norwalk River caused by the construction will be "needlessly protracted" if a movable design is adopted rather than a fixed design. That assertion does not satisfy the "injury in fact" requirement of standing. Quite simply, Plaintiffs will not suffer any concrete, particularized harm that could be avoided if Plaintiffs' preferred alternative, a fixed bridge, were selected instead of the movable bridge option that the Defendants chose.

In order to challenge the administrative decision-making process under NEPA,

---

[3] *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (allegation that development "would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations" may amount to an "injury in fact" sufficient to lay the basis for standing under section 10 of the APA).

Plaintiffs must show that their enjoyment of the area will be lessened by the challenged activity. *Friends of the Earth, Inc.*, 528 U.S. at 183 (internal citation omitted). In this case, the challenged activity is the choice to replace the current moveable Walk Bridge with another moveable bridge rather than a low-level fixed bridge alternative. Plaintiffs fail to show that their recreational and aesthetic enjoyment of the area would be lessened if a fixed bridge were chosen instead, and therefore lack standing to pursue their claim.

Plaintiffs' argument regarding the alleged recreational and aesthetic harm that they will experience as a result of the movable bridge option selected by Defendants is nonsensical because, had the fixed bridge option for which Plaintiffs advocate been selected instead, construction time would render the river unusable *for an even longer period*, between 52 and 64 months, as opposed to the estimated 40 months for the movable bridge that was selected, and dredging would still occur. Exhibit E to Final ROD, 6-7-17, Doc. No. 30-1, at RECORD0023162–64.

The movable bridge choice offers a shorter period of disruption to Plaintiffs' use and enjoyment of the river, and therefore does not lessen their recreational and aesthetic value as compared to the fixed bridge alternative. In addition, there will be fewer complete channel outages during construction of the movable bridge option, during which Plaintiffs' use of the river will be completely blocked, than there would be if the fixed bridge alternative had been selected. *Id*. Finally, the only sources of potentially toxic chemicals in the project is the existing bridge structure, which likely contains lead-based paint and PCBs and sediment that will need to be dredged regardless of which bridge alternative is built. EA/EIS, Doc. No. 28-4; at RECORD0021945–21946; *id.* at RECORD0021959; *id.* at RECORD0021993; *id.* at RECORD0022080, *id.* at RECORD0022211; *id.* at RECORD0022198-22199.

Accordingly, Plaintiffs will not suffer harm to their recreational and aesthetic interests[4] as a result of Defendants' choice to build a new movable Walk Bridge rather than a fixed bridge. Therefore, I hold that Plaintiffs lack standing to sue in this case.

Even if they do have standing to sue, however, I hold that the Norwalk River Bridge Project decision-making process was not arbitrary under NEPA and that the project was not improperly segmented, as discussed below.

### 2. *Defining the Purpose and Need Statement*

Under NEPA, an EA must include "brief discussions of the need for the proposal." 40 C.F.R. § 1508.9. Generally, agencies are given considerable deference in defining a project's Purpose and Need. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 1998). I must affirm Defendants' decision to add "maintaining or improving navigational capacity" to the definition of the Purpose and Need statement as long as they (1) presented a rational basis for making that decision, *Sierra Club v. Army Corps of Eng'rs*, 772 F.2d at 1050; and (2) did not "narrow the objective of [their] action artificially and thereby circumvent the requirement that relevant alternatives be considered." *City of New York v. United States Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1975) (internal citation omitted).

The Administrative Record clearly demonstrates that FTA and CTDOT had a rational basis for including maintaining or improving navigational capacity in the Purpose and Need Statement.

---

[4] In their complaint, Plaintiffs do not identify any aesthetic interests independent of their recreational use of the Norwalk River. It is unlikely that the Supreme Court meant to grant standing to anyone who could complain about the look of the replacement bridge (e.g., towers are too high, wrong color, lacks architectural style, etc.). At oral argument Plaintiffs' counsel sought to make such an argument. However, there will be no significant aesthetic impact from replacing the current bridge with either a fixed or movable bridge. The complaint claims potential harm to aesthetic interests that involve the construction period, when the status quo will be disrupted.

a.  Comments by agencies provided a rational basis

The Administrative Record shows that Defendants added maintaining or improving navigation to the Purpose and Need statement in response to comments received during agency and public scoping. Defs' Opp. Memo, Doc. No. 50, at 9–10. Accordingly, they have successfully articulated "a rational connection between the facts found and the choice made." *Brodsky v. U.S. Nuclear Regulatory Com'n* , 704 F.3d 113, 119 (2d Cir. 2013) (internal citations omitted). For example, the Record shows that early communications with federal and state agencies led Defendants to believe that those agencies would have refused to approve a bridge design that did not comport with current navigational clearance. Defendants point out that CTDOT initially notified the United States Army Corps of Engineers ("USACE") and USCG that the current number of maritime users who require the Walk Bridge to open was decreasing before USCG and USACE indicated that they sought to maintain current navigational capacity. Defs' Opp. Memo, Doc. No. 50, at 9 (*see* Navigational Study, Attachment G to Conceptual Engineering Report May 2015, Doc. No. 30-4, at RECORD0026013). After CTDOT provided USCG with information about limited upriver users requiring that the Walk Bridge open for their use, USCG repeatedly informed CTDOT that USCG would not approve a bridge that did not maintain current vertical navigational clearance of 60 feet – the vertical clearance established by the I-95 Bridge upstream of the Walk Bridge. *Id.* at RECORD0026014; *id.* at RECORD0024990. In addition, USCG informed CTDOT that "in establishing horizontal and vertical clearances for replacement alternatives, any span configuration should not reduce the clearances currently provided by the swing span." *Id.* at RECORD0026014.

Because the permitting agencies indicated that they would require current navigational capacity to be maintained in order to approve the project, it was rational for Defendants to include that language in the Purpose and Need Statement.

b. Defendants responded to CTOPM recommendations

During the Notice and Scoping period, CTOPM expressed procedural concerns about whether the added navigability purpose was necessary because it had not been part of the initial Notice of Scoping. Exhibit E to Final ROD, 6-7-17, Doc. No. 30-1, at RECORD0022829-30. CTOPM eventually, however, determined that the project complied with NEPA requirements. *Id.* at RECORD0023384.

NEPA does not require initial scoping (*see* FTA Standard Operating Procedures attached to FONSI, Doc. No. 30-3, at RECORD0024605) and allows for the evolution of the purpose and need statement over time with public scoping. *Id.* at RECORD0024581-87. Given that initial scoping was not required and Defendants elected to participate in that process, they should not be held to an unyielding standard. Rather than "elevating" certain considerations, Defendants adapted the purpose of the project based on feedback from agencies and the public, meeting the purpose of NEPA. Accordingly, Defendants' decision to add navigability language to the Purpose and Need Statement was not unreasonable, despite the fact that CTOPM initially expressed concern.

c. Relevant Federal Statutes support including navigability language

The Walk Bridge cannot be replaced without USCG approval. "It shall not be lawful to construct or commence the construction of any bridge, causeway, dam, or dike over or in any … navigable river, or other navigable water of the United States until the consent of Congress to the

building of such structures shall have been obtained…. However, such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Secretary of the department in which the Coast Guard is operating or by the Chief of Engineers and Secretary of the Army before construction is commenced." 33 U.S.C. § 401.

Because the Norwalk River is located wholly in the state of Connecticut, express Congressional consent is not required for the construction of a bridge across it. However, Congressional power to consent has been delegated to USCG under the General Bridge Act of 1946. *See* 33 U.S.C. §§ 525(a), (b); *Sisselman v. Smith*, 432 F.2d 750, 753 (3d Cir. 1970) ("The General Bridge Authority Act of 1946 granted the consent of Congress for the construction of bridges over navigable waters after approval by the Chief of Engineers and the Secretary of the Army as well as by the relevant local authorities. The authority of the Chief of Engineers and the Secretary of the Army has now been delegated to the Commandant of the Coast Guard and the Secretary of Transportation."). And, as discussed above, Defendants reasonably believed, based on comments made during initial scoping, that the agencies that would need to sign off on the project would not do so unless current navigability was maintained.

The Rivers and Harbors Act prohibits the construct of a bridge that would "unreasonably obstruct" navigation. 33 U.S.C. § 494. As part of that review, USCG is responsible for determining, after a study of actual navigational use of a waterway, whether or not a proposed bridge would impose an unreasonable limit on navigation. 33 C.F.R. § 116.01. USCG guidance provides that USCG's analysis must achieve a "reasonable balance between the competing needs

of land and waterborne modes of transportation." Navigation Study Attachment C to Conceptual

Engineering Report May 2015, Doc. No. 30-4, at RECORD0025918.

Even if USCG *could* approve a project that limits navigability, in this case, it was clear

that they did not plan to approve a project that would do so. The Second Circuit has held that

"there is no need to consider … alternatives which could only be implemented after significant

changes in governmental policy or legislation or which require similar alterations of existing

restrictions." *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975) (internal

citations omitted).

In addition to noting USCG's comments, CTDOT also considered USCG policy and

guidance in evaluating the scope of the Walk Bridge Replacement Project. The Coast Guard

permitting procedures provides that the USCG must consider a variety of factors when

determining navigational clearances. Navigation Study Attachment C, Doc. No. 30-4, at

RECORD0025913-6. The factors for consideration include the following: (1) existing

commercial users, (2) existing recreational users, (3) vessel trip frequency, (4) all bridges

upstream and downstream from the proposed bridge, (5) waterway layout and geometry, (6) type

and size of vessels utilizing the waterway, (7) type and size of vessels expected to utilize the

waterway during the proposed bridge lifespan, (8) review of annual cargo movements (cargo

types and quantities), and (9) mitigation proposed/complete for impacted waterway users and a

list of those impacts that cannot be mitigated. *Id.* In addition, USCG guidance provides that

USCG's analysis must achieve a "reasonable balance between the competing needs of land and

waterborne modes of transportation." Navigation Study Attachment C, Doc. No. 30-4, at

RECORD0025918.

Under that guidance, the considerations above weigh against a low-level fixed bridge being considered a "reasonable restriction" on navigation here because existing commercial and recreational users require vertical clearances above the approximately 20-foot vertical clearance of the low-level fixed bridge option. Appendix N to Conceptual Engineering Report May 2015, Doc. No. 30-4, RECORD0025881. The existing minimum vertical clearance of the I-95 Bridge upstream of the Walk Bridge is 60 feet, 40 feet higher than the low-level fixed bridge alternative. *Id.* at RECORD0025878-25879. CTDOT reviewed and considered that guidance as part of its determination that a low-level fixed bridge was an unreasonable alternative. Navigation Study Attachment C, Doc. No. 30-4, at RECORD0025913; *id.* at RECORD0025920.

Accordingly, based on evidence that the required agencies would not approve a fixed bridge option, I hold that Defendants properly narrowed the scope of the Purpose and Need statement. Defendants present a "rational basis…for the decision reached." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d at 1050.

### 3. *Studying Reasonable Alternatives*

The Second Circuit has directed agencies to "consider such alternatives to the proposed action as may partially or completely meet the proposal's goal." *City of New York*, 715 F.2d at 742–43; *Nat. Res. Def. Council, Inc.*, 524 F.2d at 93. Although an EA is typically a shorter document than an Environmental Impact Survey ("EIS"), an EA's consideration of alternatives must be "full and meaningful." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 F. App'x 440, 443 (9th Cir. 2007) (citation omitted). Furthermore, "a conclusory and uninformative" discussion of an alternative is "fatally inadequate." *I- 291 Why? Ass'n v. Burns*, 372 F. Supp. 223, 249 (D. Conn. 1974), *aff'd*, 517 F.2d 1077 (2d Cir. 1975).

The parties dispute whether Defendants meaningfully studied a fixed bridge as a complete NEPA project alternative before dismissing it as an option. Plaintiffs contend that a low-level fixed bridge option is a reasonable alternative because: (1) it would meet all but one of the project purpose criteria and would meet several criteria "more fulsomely than a moveable bridge"; (2) it would allow for some current marine traffic; (3) and other marine traffic "could be mitigated." Pl's Memo, Doc. No. 42-1, at 34–35. Defendants argue that "even if those statements are true, Plaintiffs have not provided evidence that FTA and CTDOT's determination that a low-level fixed bridge is not a reasonable alternative was arbitrary or capricious." Def's Opp. Memo, Doc. No. 50, at 17. Defendants argue that the FTA properly and adequately considered alternatives that satisfied the Walk Bridge Project. *Id.* at 35. They contend that they considered the Low-Level Fixed Bridge alternative, despite the fact that they added navigability language in the Purpose and Need statement. Defs' Memo, Doc. No. 43-1, at 40. They contend that the fixed bridge options were discussed in preparing the EA, but ultimately not "advanced for further consideration." *Id.*

a. Studying the low-level fixed bridge at the conceptual level

FTA and CTDOT's conceptual review of the low-level fixed bridge alternative met NEPA's requirement that it "consider" the low-level fixed bridge alternative because "courts have held that NEPA does not require an agency to study 'in detail' projects that partially meet a project's goals." Defs' Opp. Memo, Doc. No. 50, at 25–26 (citing *Citizens' Comm. to Save our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1020, 1031 (10th Cir. 2002) (alternatives that do not accomplish the purpose of an action are not reasonable and do not need to be studied in detail)).

CTDOT's engineers considered the rehabilitation option and the high-level fixed bridge alternative during initial conceptual engineering, noting that it would meet the clearance requirements provided by statute, but determined that the high-level option would lead to increased costs, take longer to build, have an additional impact on waterway users, and might potentially lead to Right of Way concerns. Conceptional Engineering Report May 2015, Doc. No. 30-4, at RECORD0024989. Accordingly, the high-level option was not selected.

FTA and CTDOT also considered fixed-bridge alternatives during initial public and agency scoping. CTDOT's engineering consultant studied the fixed bridge alternative, evaluating the potential cost, length of construction time, and environmental impacts. Misc. Administrative Record, Doc. No. 31-4, at RECORD0039805-39807; *id.* at RECORD0040167-40169; Misc. Administrative Record, Doc. No. 31-5, at RECORD40581-40582.

Although Plaintiffs argue that Defendants should have conducted empirical studies of current and future river use, Defendants are not required to do so. Defendants published a white paper addressing the Low-Level Fixed Bridge alternative. Misc. Administrative Record, Doc. No. 31-5, at RECORD0041555, containing a link to a PDF containing Defendants' white paper. Defendants also published an Issue Paper regarding the Fixed Bridge Alternative. Appendix E to Conceptional Engineering Report May 2015, Doc. No. 30-1, at RECORD0023155. Defendants considered numerous factors, not merely navigability concerns connected with the fixed bridge alternatives, and ultimately decided that the fixed level bridge alternatives unreasonably restricted navigation or were too costly or burdensome to construct. Even if it was possible that FTA and CTDOT might have been able to convince USCG that a low-level fixed bridge option would be a reasonable restriction on navigation, Defendants are correct in asserting that "NEPA did not require [Defendants] to take on the challenge." Defs' Memo, Doc. No. 50, at 30–31.

Accordingly, Defendants considered relevant factors and made an informed decision when they rejected the low-level fixed bridge alternative, thereby meeting NEPA's requirements.

### b. Resiliency concerns

System resiliency refers to "the ability to return the bridge to use either partially or completely, in a relatively short period of time in the aftermath of a compromising event. It also refers to minimizing the vulnerability of critical elements of the bridge to facilitate its return to use." EA/EIE, Doc. No. 28-4, at RECORD0022184.

As discussed above, Defendants' decision not to move forward with the fixed bridge options were reasonable. Accordingly, resiliency considerations did not create a requirement that Defendants further consider the low-level fixed bridge option, and Defendants presented a "rational basis…for the decision reached." *Sierra Club*, 772 F.2d at 1050.

### 4. *Public Comments*

NEPA requires that an EA include only "brief" discussions of the need for the project, alternatives and environmental impacts. 40 C.F.R. § 1508.9(b); 40 C.F.R. § 1501.3(b)(2001). Furthermore, NEPA does not require that agencies provide detailed information about rejected alternatives. *See Nat'l Post Office Collaborate,* 2014 WL 6686691, at *8. The Second Circuit has held that the public participation requirement is satisfied so long as an agency is made aware of the public's concerns before the agency reaches its final decision. *See, e.g., Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1238-39 (2d Cir. 2002). However, NEPA does not permit Defendants to ignore significant questions raised in public comments or shunt them aside with "mere conclusory statements." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1179 (9th Cir. 1982).

Plaintiffs allege that FTA and CTDOT (1) did not adequately study maritime traffic; (2) did not study future maritime traffic; (3) did not study the safety benefits of a fixed bridge; (4) failed to study necessary related projects; and (5) failed to study means of mitigating the navigational access impacts of a fixed bridge on the two businesses that would be affected. Pls' Memo, Doc. No. 42-1, at 40–41.

Defendants provided more opportunities for public comment and participation than is required by NEPA. As discussed above, Defendants voluntarily conducted initial scoping and then responded accordingly by investigating whether USCG and other agencies would require maintaining navigability. In addition, Defendants circulated a draft of the EA and held meetings in which they solicited comments, as well as conducting a longer comment period than was required. FTA Standard Operating Procedures attached to FONSI, Doc. No. 30-3, at RECORD0024605; *id.* at RECORD0024578; *id.* at RECORD0024623-24624; Final ROD 6-7-17, Doc. No. 30-1, at RECORD0022539; Appendix 2 to EA/EIS, Doc. No. 28-4, at RECORD0022321-22323; *id.* at RECORD0022326-22384; Final ROD 6-7-17, Doc. No. 30-1, at RECORD0022540-22542; Misc. Administrative Record, Doc. No. 31-5, at RECORD0040482-40489; Appendix D to Final ROD, 6-7-17, Doc. No. 30-1, RECORD0022652-22653; Misc. Administrative Record, Doc. No. 31-4, at RECORD0038118-38120; Misc. Administrative Records, Doc. No. 31-4, at RECORD0038123; Exhibit E to Final Rod, 6-7-17, Doc. No. 30-1, at RECORD0023101-23105; *id.* at RECORD23120-23122.

Plaintiffs had multiple opportunities to comment on the project proposal, and Defendants were aware of Plaintiffs' concerns and addressed those comments in a manner consistent with NEPA. FTA Standard Operating Procedures attached to FONSI, Doc. No. 30-3, at RECORD0024626. Although Defendants did not revise the EA, they were not required to do so

under NEPA. *Id.* at RECORD0024629-24627. Therefore, I hold that Defendants properly responded to Plaintiffs public comments under NEPA.

    5.  *Unlawful Segmentation/Studying Related Actions*

    NEPA regulations require an agency to consider connected, cumulative, or similar actions in the same environmental impact statement. *See* 40 C.F.R. § 1508.25(a). The regulations further define each of those three terms. A "connected action" is an action that is "closely related" to the main action, which includes (i) actions which are "[a]utomatically trigger[ed]" by the main action, (ii) actions without which the main action "[c]annot or will not proceed," or (iii) actions which "are interdependent parts of" the main action and "depend on [it] for their justification." 40 C.F.R. § 1508.25(a)(1)(i)-(iii). As the Second Circuit has explained, "[t]he proper test" for whether or not an action qualifies as "interdependent" under 40 C.F.R. § 1508.25(a)(1)(iii) "is whether the project has independent utility." *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 312 (2d Cir. 2009). Next, a "cumulative action" is an action "which when viewed with other proposed actions [has] cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2). Finally, a "similar action" is an action "which when viewed with other reasonably foreseeable or proposed agency actions, [has] similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3).

    "A project has been improperly segmented … if the segmented project has no independent utility, no life of its own, or is simply illogical when viewed in isolation." *Stewart Park & Reserve Coal, Inc. v. Slater*, 352 F.3d 545, 559 (2d Cir. 2003). Improper segmentation

occurs when an agency attempts to circumvent NEPA by dividing a federal action into smaller components to avoid studying the overall impacts of the single action. *Id.* A project, however, is properly segmented if it "(1) connects logical termini and is of sufficient length to address environmental matters of a broad scope; (2) has independent utility or independent significance; and (3) will not restrict consideration of alternatives for other reasonably foreseeable transportation improvements." *Id.* (internal citation omitted). A project has "independent utility" if the project has an independent function, "regardless of whether the other is built." *See id.* at 560.

In this case, the FTA correctly determined that the Danbury Dockyard and Control Point ("CP")-234 Universal Interlocking Projects were properly segmented because they have independent utility, logical termini, and do not foreclose the opportunity to consider alternatives. The other projects about which Plaintiffs complain were properly addressed in the EA.

a. Danbury Dockyard Project and CP-243 Project

The two rail infrastructure projects that Plaintiffs allege were improperly segmented, the Danbury Dockyard Project and the CP-243 Universal Interlocking Project, have independent utility and were therefore properly segmented.

The Dockyard Project has independent long-term benefits, such as additional electrified tracks to prevent Danbury Line service disruptions that currently take place without proper track configurations. EA/EIE, Doc. No. 28-4, at RECORD0022003; CP-243 Categorical Exclusion, Doc. No. 31-1, at RECORD0031406. The CP-243 Project includes upgrades that will create the following long-term benefits: overall flexibility in train movements in the event of service disruptions and providing flexibility to route trains from any track west to any track east in both

directions. Exhibit E to Final ROD 6-7-17, Doc. No. 30-1, at RECORD0023170. Express trains will also be able to pass local trains with limited time intervals between trains. *Id.* This will allow for greater capacity to accommodate trains and increased ridership. *Id.*

The Dockyard project and the CP-243 project each received a separate environmental review under NEPA. Appendix E to Final ROD 6-7-17, Doc. No. 30-1, at RECORD0023171; CP243 Categorical Exclusion, Doc. No. 31-1, at RECORD0031382-31576. The projects are needed to perform the extensive State of Good Repair and improvements projects that will improve long-term improvements to the New Haven Line and will reduce train delays and expedite construction projects that take tracks out of service. Appendix E to Final ROD 6-7-17, Doc. No. 30-1, at RECORD0023169.

Although the projects have independent utility, the improvements could also promote train operation efficiencies during the Walk Bridge Replacement construction because they could alleviate train traffic issues resulting from the track outages occurring during Walk Bridge construction. As the Supreme Court held in *Stewart*, however, merely because "two projects are interrelated as part of an overall transportation plan does not mean that they do not individually contribute to alleviation of the traffic problems…." *Stewart*, 352 F.3d at 560.

Each project could go forward without the other being built, although the Norwalk Bridge Replacement Project would be more disruptive. EA/EIE, Doc. No. 28-4, at RECORD0021960; Appendix E to Final ROD 6-7-17, Doc. No. 30-1, at RECORD23169-23170. Accordingly, those two projects were properly segmented.

b. Eversource Transmission Lines and Metro-North Communication Lines

The *removal* of the Eversource Transmission lines was included in the Walk Bridge Replacement EA, including where construction might affect public utilities. EA/EIE, Doc. No. 28-4, at RECORD0022174; *id.* at RECORD0022212. Accordingly, that piece of the project was not segmented.

The *relocation* of the Eversource Transmission lines was properly segmented because that part of the project has independent utility: regardless of whether the Walk Bridge Project moves forward, those lines will need to move because the high towers are structurally unsound and require replacement. EA/EIE, Doc. No. 28-4, at RECORD0021934; *id.* at RECORD0021993; *id.* at RECORD0023141. Because the transmission lines sit on the towers, they need to be removed and relocated. *Id.* at RECORD0023141; *id.* at RECORD0021959; Appendix E to Final ROD 6-7-17, Doc. No. 30-1, at RECORD0023155-56. The relocation of those lines has an independent function regardless of whether the Walk Bridge Replacement Project is built; therefore, the relocation was not improperly segmented. *See Stewart*, 352 F.3d at 559.

c. All Other Projects

The impacts of the Tower Replacement Project were considered in the EA. EA/EIE, Doc. No. 28-4, at RECORD0021945; *id.* at RECORD0022001-22004; *id.* at RECORD0022151; *id.* at RECORD0022174. The impacts of the Fort Point Bridge Replacement were also considered in the EA. *Id.* at RECORD0021945; *id.* at RECORD0022002-22004; *id.* at RECORD00220121; *id.* at RECORD00220124; *id.* at RECORD00220132. Furthermore, the EA also properly considered the impacts of replacement of the one-half mile tracks and ballast. *Id.* at RECORD0021983; *id.*

at RECORD0022002-22004. Finally, the EA also properly considered the replacement of overhead catenary, supports and signal equipment. *Id.* at RECORD0022002-22004. Accordingly, those projects were not segmented, but instead were reviewed properly under NEPA.

Because no project components were improperly segmented, summary judgment is granted on behalf of the Defendants on the issue whether Defendants properly studied related actions.

## IV.    Conclusion

For the reasons set forth above, the Defendants' motions for summary judgment (doc. no. 43, 44) are granted and the Plaintiffs' motion for summary judgment (doc. no. 42) is denied. The Clerk shall enter judgment for the Defendants and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 8th day of July 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
